UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| JACK BEAUCHAMP JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| | ) |
| LINCOLN NATIONAL LIFE | ) |
| INSURANCE COMPANY, | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

COMES NOW Plaintiff, Jack Beauchamp Jr., and for his claims and causes of action against Defendant, Lincoln National Life Insurance Company, states as follows:

### PARTIES

1. Jack Beauchamp ("Beauchamp") is a resident and citizen of the State of Kansas.

2. Defendant Metropolitan Life Insurance Company ("Lincoln") is an out-of-state insurance company authorized to do business in the State of Kansas. The Commissioner of the Kansas Department of Insurance is authorized to accept service of process on behalf of Lincoln.

### JURISDICTION AND VENUE

3. Beauchamp brings his claim pursuant to the Employment Retirement Income Security Act ("ERISA") and 29 U.S.C. § 1001 *et seq.*

4. This dispute is governed by a welfare benefits plan and its policy documents, as well as applicable federal law regarding employer provided benefits. 29 U.S.C. § 1132(e)(1).

1

5. This Court also has subject matter jurisdiction pursuant to the general jurisdictional statute for civil actions arising under federal law. 28 U.S.C. § 1331.

6. Venue lies in the District of Kansas under 29 U.S.C. § 1332(e)(2), as the breach occurred in this district, and because the welfare benefits plan is administered in this district.

7. Venue is also proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and/or omissions giving rise to this action occurred within this judicial district.

## INFORMATION REGARDING TRIAL

8. No jury trial is allowed under ERISA law.

9. Trial is to be held in Kansas City, Kansas.

## STATEMENTS OF FACT

10. Barry-Wehmiller Companies, Inc. ("BW") employed Beauchamp as a sales manager beginning in 2017.

11. Beauchamp remained actively at work until December 28, 2018.

12. During his employment, Beauchamp was an "active, full time employee working in the United States."

13. Prior to and during his employment, Beauchamp suffered from a number of health conditions, including ongoing complications from adult onset epilepsy, seizure disorder with migraine headache, ventricular atrial fibrillation, lung disease and degenerative disc disease. These conditions eventually rendered his incapable of continuing his job on a full-time, competitive basis.

14. BW sponsored a group long-term disability ("LTD") benefits plan ("Plan") for its participating employees.

15. The Plan constitutes employee welfare benefit plans as defined by 29 U.S.C. § 1002 (1).

16. The Plan offered disability benefits to qualifying BW employee Plan participants.

17. At all relevant times, Beauchamp has been a participant and covered person under the terms of the Plan.

18. BW is the administrator of the Plan.

19. The Plan's disability provisions are insured by a policy written by Lincoln.

20. BW delegated or attempted to delegate the function of issuing LTD claim determinations to Lincoln.

21. BW and Lincoln entered into an administrative services contract through which BW paid Lincoln for acting as claims administrator.

22. Beauchamp attempted and failed working for the last day on December 28, 2018.

23. After having to cease work, Beauchamp through counsel, requested all plans in which he was enrolled as of his last day working.

24. BW complied with the request and produced among other plan documents, the LTD policy.

25. Following this document production, Beauchamp applied to Lincoln for long-term disability ("LTD") benefits, submitting a signed claim form, a signed Authorization to Release Personal Information, a signed Authorization to Disclose Health Information to My Employer, a Representation Authorization, a list of his health care providers, and 600 pages of medical records.

26. On December 14, 2023, Lincoln wrote to Beauchamp advising his that the LTD claim had been received but that more information may be needed to make a decision on his claim.

27. On January 30, 2024, Lincoln denied Beauchamp's claim based on a clerical error in his date of disability, which Beauchamp promptly corrected.

28. On January 30, 2024 Beauchamp requested a copy of his claim file which Lincoln provided on February 1, 2024.

29. The Plan and Policy articulate the conditions under which a Plan participant is entitled to LTD benefits.

30. The Policy defines the term "Disabled" as follows:

> "Disability" or "Disabled" means:
>
> 1. For persons other than pilots, co-pilots, and crewmembers of an aircraft:
>
> Applicable to Class 1, 2, 3:
>
> a. if the Covered Person is eligible for the Maximum Own Occupation benefit, "Disability" or "Disabled" means during the Elimination Period and until the Covered Person reaches the end of the Maximum Benefit Period, as a result of an Injury or Sickness, he is unable to perform the Material and Substantial Duties of his Own Occupation.

31. Both ERISA and the Policy itself require such denials to provide specific information, including:

    a. The specific reason(s) the claim was denied.

    b. Specific reference to the Policy provision(s) on which the denial was based.

    c. Any additional information required for the claim to be reconsidered, and the reason this information is necessary.

    d. If the case of any claim for a disability benefit, identification of any internal rule, guideline or protocol relied on in making the claim decision, and an explanation of any medically-related exclusion or limitation involved in the decision.

    e. A statement regarding the right to appeal the decision, and an explanation of the appeal procedure, including a statement of the right to bring a civil action under Section 502(a) of ERISA if the appeal is denied.

4

32. On July 25, 2024, Beauchamp appealed Lincoln's denial.

33. In his appeal, Beauchamp provided medical evidence supporting his disability.

34. In January 2002, while on a business trip, Beauchamp felt ill. Upon his return home, he consulted with a physician. Subsequent testing revealed that he had bicuspid aortic valve, a congenital heart defect that occurs when two of the aortic valve's leaflets fuse during fetal development, resulting in a valve with two flaps, or cusps, instead of the normal three.

35. In March of 2002, Beauchamp underwent open heart surgery to replace an organic valve with a mechanical one. He also received an onboard defibrillator.

36. In April 2002, Beauchamp had a Medtronic ICD implanted following an echocardiogram finding ejection fraction 17%.

37. In 2004, Beauchamp had his first Grand Mal seizure and was airlifted to Olathe Medical Center in Olathe, Kansas.

38. On July 11, 2005, Beauchamp underwent a carotid doppler and echocardiogram finding and ejection fraction of 50-55%.

39. In 2007, he suffered another seizure.

40. In 2009, he began suffering seizures more frequently. He was placed on medication in an effort to manage or prevent further seizure activity but continued to suffer from seizures over the next several years.

41. On September 29, 2011, Beauchamp underwent a pulmonary function test.

42. On November 1, 2013, Beauchamp underwent a cholecystectomy.

43. On March 25, 2015, Beauchamp underwent a pulmonary function test.

44. On December 30, 2015, Beauchamp underwent an EGD.

45. On January 18, 2016, Beauchamp underwent an echocardiogram finding ejection fraction 60%.

46. On August 30, 2016, Beauchamp underwent an EEG.

47. In 2018, after having been employed by BW and insured under a group LTD policy for more than 12 months, Beauchamp's seizures became unmanageably frequent.

48. In December 2018, Beauchamp went out of work on Short Term Disability and paid FMLA which lasted until February 2019.

49. On August 24, 2018, Beauchamp underwent another Echocardiogram finding an ejection fraction of 55-60%.

50. Beauchamps job required him to be seizure-free for at least six consecutive months, and in 2018 he was forced to cease driving.

51. Beauchamps job also required extensive travel.

52. Beauchamp's condition interferes with his memory.

53. Beauchamp last physically attempted to work in late December 2018.

54. On November 24, 2018, Beauchamp underwent an echocardiogram finding and ejection fraction of 50-55%, trace mitral and pulmonary insufficiency, and mild tricuspid insufficiency.

55. On December 28, 2018, he requested a temporary leave of absence, hoping that he could better manage his conditions.

56. Beauchamp remained employed with BW and insured under the group LTD policy until February 2019, when his leave ended.

57. Beauchamp was unable to return to work in February 2019 and was terminated by BW.

58. Since ceasing work Beauchamps seizure activity has increased in frequency and severity.

59. On February 27, 2019, Beauchamp underwent another echocardiogram.

60. On April 24, 2019, Beauchamp underwent another echocardiogram finding ejection fraction of 45%, grade 2 diastolic dysfunction and mild concentric left ventricular hypertrophy.

61. On October 13, 2020, Beauchamp underwent an echocardiogram finding ejection fraction of 50-55%, mean gradient across aortic valve 9 mm, trace mitral insufficiency, mild tricuspid insufficiency and mildly dilated aortic root and ascending aorta at 3.8 and 3.6 respectively.

62. On August 31, 2021, Beauchamp underwent a Pulmonary Function Test finding: FVC 3.07 Lor 73%, FEV1 2.15 L or 67%, FEV1/FVC ratio of 70, FEF 25-75% 1.3 L/secor 50%. Findings are suggestive of moderate obstructive pulmonary disease. After bronchodilator treatment, FVC improved by 2%, FEV1 improved by 14%, FEF 25-75% improved by 64%. Findings are suggestive of underlying hyperreactive airway disease such as asthma. Total lung volume study showed total lung capacity 4.80 Lor 81% with residual volume 1.47 L or 67%. Findings are lower end of normal limits. Diffusion capacity study showed normal DLCO at 18.9 mL/mmHg/min or 88%. Arterial blood gas on room air showed pH 7.39, pCO2 39, PO2 69.9, bicarb 23.8, oxygen saturation 93.3%. Exercise pulse oximetry on room air showed oxygen saturation at rest 96% with heart rate at 60. During the 6 minutes ambulation on room air, patient's lowest observed 02 saturation 92% with heart rate at 90. After resting 2 minutes, oxygen saturation improved to % with heart rate down to 70.

63. On December 17, 2021, Beauchamp was seen by Dr. Sheikh for adjustment of his vagal nerve stimulator.

64. On January 12, 2022, Beauchamp was seen by Dr. Sheikh for follow up. Dr. Sheikh scheduled an EMG nerve conduction study.

65. On March 1, 2022, Beauchamp was seen by Dr. Sheikh for follow up.

66. On May 2, 2022, Beauchamp was seen by Dr. Sheikh for follow up on his seizure disorder. Dr. Sheikh continued his medications and scheduled a follow up in 3 months.

67. On May 9, 2022, Beauchamp was seen by Dr. Sheikh who recorded that Beauchamp was found to have progressive calcium deposit involving eye lenses and liver, that Beauchamp had a recent hospitalization for seizure several weeks prior, and that Beauchamp had a suspected allergic reaction to one of his medications. Dr. Sheikh reviewed Beauchamps records and recorded that compared to his PFT in September 2011, Beauchamps FVC had decreased, and that his total lung capacity had also decreased.

68. On June 7, 2022, Beauchamp was seen by Dr. Sheikh who noted tremors, sensory motor polyneuropathy, throat and chest discomfort, leg discomfort, worsening cough, and mood disorder. Beauchamp was to continue taking his medications and follow up in the Neurology clinic in 6-8 weeks.

69. On July 7, 2022, Beauchamp was seen by Dr. Green, for follow up on his cardiologic conditions, Beauchamp reported fatigue. Dr. Green reviewed his recent EKG's and suggested follow-up in 6 months.

70. On July 19, 2022, Beauchamp was seen by Dr. Spratt for fatigue, rash, back issues and anxiety. Dr. Spratt planned to check labs, monitor his medications, and discuss with neurology.

71. On August 16, 2022, Beauchamp was seen by Dr. Spratt for follow up on seizures, ear pain, cough, sinus drainage, and diarrhea. Dr. Spratt records that prior to the visit Beauchamp had a prolonged seizure that his wife treated with nasal versed and had to be treated by EMS. Beauchamp was Postictal on arrival to the ER. Dr. Spratt discussed his seizures, neurology follow up, medications, rash, and reconsidering one of his medications.

72. On October 4, 2022, Beauchamp was seen by Dr. Sheikh for follow up on his seizure disorder. Dr. Sheikh continued his medications and scheduled a follow up in the Neurology clinic in 4-5 months.

73. On October 21, 2022, Beauchamp was seen by Dr. Spratt for back pain. On examination there was some tenderness over the right SI joint and right paraspinous muscles. Dr. Spratt had an x-ray taken showing arthritic changes, and prescribed topical medications, and physical therapy.

74. On November 8, 2022, Beauchamp was seen by APRN David Cocanower, for obstructive sleep apnea, who recorded that Beauchamp has a history of sleep testing at Olathe Medical Center in 2011 that documented prominent hypoxemia during sleep. Following the study he was prescribed supplemental oxygen. An overnight oximetry study performed on room air 08/25/2021 revealed 02 saturation undulation in a pattern suggesting obstructive sleep apnea. He had 109 minutes of time spent with 02 saturation less than 88% with a nadir 02 saturation of 82%. The oxygen desaturation index was 25/hour. He reports restless legs symptoms and has been treated with pramipexole 0.25 mg taken in the evening for the last several years. He acknowledges daytime sleepiness with an Epworth Sleepiness Scale score of 17. His sleep apnea quality of life

questionnaire score is 61. He does not drive because of his seizure disorder. Beauchamp reported that he gets 6-7 hours of sleep on a good night and 3-4 hours on a bad night and may have 1 bad night per week. He attributes insufficient hours of sleep at times to seizures and has had seizures during sleep. APRN Cocanower suggested further sleep testing and ordered an in-lab polysomnogram, then a return visit to review the results. APRN Cocanower also suggested the use of a short-acting hypnotic to help Beauchamp return to sleep on nights when he has awakened early and cannot get back to sleep, and suggested to continued his pramipexole.

75. On November 10, 2022, Beauchamp began physical therapy for osteoarthritis and pain in his left ankle.

76. On November 29, 2022, Beauchamp underwent a sleep study. During the study there were 70 apneas and hypopneas for an apnea-hypopnea index (AHI) of 10.6/hour. There were 3 obstructed apneas, 1 central apneas, 0 mixed apneas, and 66 hypopneas.

77. On December 8, 2022, Beauchamp was seen by Dr. Spratt for left ear irritation and fullness. Beauchamp was told to monitor his blood pressure and was put on Coricidin.

78. On February 28, 2023, Beauchamp was seen by Dr. Spratt, following his hospitalization for a significant seizure. On examination he had bruising under the eyes. Dr. Spratt reviewed his hospitalization records and found septicemia. Beauchamp was to return in one month.

79. On February 3, 2023, Beauchamp was seen by Dr. Bob Green, for a follow up on his cardiac conditions. Dr. Green recorded that roughly a month ago, Beauchamp went to the emergency room and was started on Cipro resulting in a seizure 2 days later. Beauchamp reported changes in his blood pressure and fatigue.

80. On February 7, 2023, Beauchamp was seen by Dr. Sheikh, who documented a breakthrough seizure several weeks ago that was treated with a tranxene short course. Dr. Sheikh continued his medications and advised Beauchamp to return in one month and again in 6 months to the cardiology care clinic to check his pacemaker.

81. On February 19, 2023, Beauchamp underwent a cervical spine CT finding mild anterolisthesis at C2-C3 and C3-C4., trace retrolisthesis at C5-C6, and trace anterolisthesis also noted at C7-T1. The CT also found severe degenerative disc disease in the mid to lower cervical spine, posterior disc osteophytic complex is examination with facet and uncovertebral hypertrophy, results in varying levels of spinal and neural foraminal stenosis, and degenerative changes at the tip of the odontoid.

82. On February 21, 2023, Beauchamp underwent a chest x ray, that indicated acute hypoxic respiratory failure with aspiration pneumonia.

83. On February 28, 2023, Beauchamp was seen by Dr. Farhan Sheikh, who recorded that Beauchamp was recently hospitalized because of a breakthrough seizure, and was found lying on the floor unconscious by his wife after 7 hours with a bleeding face due to hitting his head during the seizure. Dr. Sheikh found that Beauchamp continued to struggle with balance, had a mood disorder, had mild memory problems, has peripheral neuropathy, and restless leg syndrome. On examination, Beauchamp had decreased pinprick in the limbs distally and had mild postural tremor. Dr. Sheikh assessed that Beauchamp had intractable complex partial epilepsy status post VNS implantation with recent breakthrough seizure causing head trauma with likely head concussion which is causing patient to have slight balance problems now. Beauchamp was to continue taking medications and follow up clinically for cognitive decline and mood disorder. Dr. Sheikh

also recommended using Nayzilam for recurrent auras or seizures, and to follow up with neurology in 4-5 months.

84. On June 20, 2023, Beauchamp was seen by Dr. Dennis Spratt, who reviewed his labs, referred him to an ENT to discuss epiglottis, his cheek muscles, and emboucher, and referred him to a neurologist. Beauchamp was to continue taking his medications as prescribed.

85. Beauchamp has at all relevant times met the definition of "Disability" under the Plan and is entitled to benefits.

86. Beauchamp timely appealed Lincoln's denial of his claim for benefits.

87. On August 29, 2024, Lincoln upheld its denial of benefits.

88. Lincoln did not perform a medical review of Beauchamp's claim, review Beauchamp's occupational requirements, request a single medical record, contact his medical providers, refer the claim to an independent medical professional, and did not perform a function-by-function analysis prior to its denial.

89. Lincoln's sole basis for denial was that Beauchamps notice of claim was not timely provided.

90. Lincoln has not identified any prejudice from the late notice of the claim.

91. Beauchamp has presented a colorable claim for LTD benefits to Lincoln.

92. Beauchamp has exhausted his administrative remedies and Lincoln refuses to take further action in connection with his claim.

CAUSES OF ACTION

COUNT I
29 U.S.C. § 1132(a)(1)(B) – WRONGFUL DENIAL OF BENEFITS

93. Beauchamp realleges the preceding paragraphs as if fully set forth herein.

94. Beauchamp is entitled to all unpaid and accrued LTD benefits, as Lincoln:

    a. Made an unfavorable decision without substantial evidence;

    b. Failed to properly consider Taylor's medical impairments and resulting limitations; and

    c. Issued an unfavorable decision that was arbitrary and capricious.

95. Lincoln has not satisfied its obligation to pay Beauchamp's LTD benefits.

96. Lincoln denied LTD benefits when the applicable medical record supports upholding LTD benefits.

97. WHEREFORE, pursuant to 29 U.S.C. § 1132(a)(1)(B) and 29 U.S.C. § 1132(g), Beauchamp prays for judgment against Lincoln for unpaid LTD benefits, attorney's fees, costs, and prejudgment interest.

## COUNT II
## 29 U.S.C. § 1132(a)(3) – BREACH OF FIDUCIARY DUTY

98. Beauchamp realleges the preceding paragraphs as if fully set forth herein.

99. Under 29 U.S.C. § 1002(21)(A), a fiduciary is one who:

    "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property or such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."

100. 29 U.S.C. § 1104(a)(1)(A) describes the fiduciary standard of care:

    "a fiduciary shall discharge her duties with respect to a plan solely in the interest of the participants and beneficiaries and – for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

13

101. Lincoln, the Plan's designated claims administrator, is a fiduciary.

102. Lincoln participated in and benefitted from the Plan as previously indicated.

103. Lincoln's claims management practices are motivated by financial incentives in its administrative services agreement with HCA.

104. As the payor of benefits and the entity responsible for exercising discretion in claims administration, Lincoln operates under an inherent conflict of interest.

105. A higher than marketplace quality standard, as set forth in *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 (2008) governs the actions of a fiduciary.

106. Lincoln breached its fiduciary duty in:

    a. Failing to comply with its internal guidelines and claims handling procedures. Its claim handlers did not comply with documented instructions involving the administration of disability claims, including its procedures involving coverage and eligibility determinations;

    b. Refusing to administer the claim when the 180-day deadline was extended by National Emergency;

    c. Failing to properly administer the claim;

    d. Engaging in a structural conflict of interest by assuming the role of both claims administrator and payor of benefits;

    e. Failing to properly consider competent medical and vocational opinion evidence, and/or failing to specifically explain why it did not agree with such evidence;

    f. Failing to provide a copy of the applicable policy and documents; and

    g. Refusing to utilize fully executed authorizations to attempt to obtain all relevant evidence to Beauchamp's claim for benefits;

107. Lincoln denied Beauchamp's LTD benefits for the purpose of elevating its financial interests. In doing so, it breached its fiduciary duties.

108. Lincoln failed to discharge its duties solely in the interests of its participants and beneficiaries. It acted with both a conflict of interest and breached its fiduciary duty to both Beauchamp and the Plan's participants and beneficiaries generally.

109. Lincoln's improper conduct demonstrates that ordinary relief under § 1132(a)(1)(B) is not an adequate remedy.

110. Lincoln's violations of regulations alone allow Beauchamp the right to pursue any remedy under Section 502(a) of ERISA, including § 1132(a)(3). 29 C.F.R. § 2560.503-1(1)(2)(i).

111. Lincoln's violations of federal regulation also subject its decision to *de novo* review.

112. WHEREFORE, pursuant to 29 U.S.C. § 1132(a)(3), § 1109, and § 1132(a)(2), Beauchamp prays for an order that Lincoln retrain its employees consistent with ERISA fiduciary obligations and federal regulations; for reformation of its services agreement with the plan administrator consistent with ERISA fiduciary obligations and federal regulations; for an injunction preventing further unlawful acts by Lincoln in its fiduciary capacity; for an equitable accounting of benefits that Lincoln has withheld; for the disgorgement of profits enjoyed by Lincoln in withholding benefits; for restitution under a theory of surcharge; for the Court's imposition of a constructive trust; for an award of attorney fees; and for further relief as the Court deems just.

        Respectfully submitted,

        BURNETTDRISKILL, Attorneys

        By: /s/ Derrick A. Pearce
        Derrick A. Pearce, KS # 16752

                      Benjamin R. Narrell, KS, #79228
                      103 W 26th Ave., Ste. 290
                      North Kansas City, MO  64116
                      P: 816.781.4836
                      F: 816.792.3634
                      dpearce@burnettdriskill.com
                      bnarrell@burnettdriskill.com
                      ATTORNEYS FOR PLAINTIFF